[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-13267
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEP 07, 2011
JOHN LEY
CLERK

D. C. Docket No. 06-01078-CV-BE-S

KENNETH LOGGINS,

Petitioner-Appellant,

versus

KIM T. THOMAS, Interim Commissioner,
Alabama Dept. of Corrections,
THE ATTORNEY GENERAL OF THE
STATE OF ALABAMA, LUTHER STRANGE,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 7, 2011)

Before CARNES, ANDERSON and FARRIS,[*] Circuit Judges.

CARNES, Circuit Judge:

_____

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by
designation.

Kenneth Loggins was convicted and sentenced to death in 1995 for the sadistic and brutal murder of Vickie Deblieux.  Because he was seventeen years old when he committed the murder, the state courts eventually set aside his death sentence based on Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183 (2005), which held that it was unconstitutional to execute anyone who was under eighteen years of age at the time of the crime, id. at 578–79, 125 S.Ct. at 1200.  See Loggins v. State, No. CR-04-1567 (Ala. Crim. App. Dec. 8, 2005) (order remanding to trial court for resentencing).  Loggins was resentenced to life imprisonment without parole, see Loggins v. State, No. CR-04-1567 (Ala. Crim. App. Apr. 21, 2006) (unpublished memorandum opinion), which was the next most severe penalty Alabama law provided for the crime that he had committed, see Ala. Code §§13A-5-39, 13A-5-45.  Having escaped the death penalty Loggins now seeks to escape his life without parole sentence, contending that it, too, is an unconstitutional penalty for him because he was not yet eighteen years old at the time he committed the murder.

I.

On the night of February 21, 1994, a friend dropped Vickie Deblieux off on Interstate 59 near Chattanooga, Tennessee.  She intended to hitchhike to her mother's home in West Monroe, Louisiana, and had telephoned her mother to let

her know that she was coming.  Deblieux made it as far south as Jefferson County, Alabama.  Unfortunately for her, Kenneth Loggins and three of his friends were also out that night, drinking beer and using drugs.  They spotted Deblieux at an interstate exit in Jefferson County.

Promising to take her to Louisiana, Loggins and the other men lured Deblieux into their car and then drove her to a remote wooded area on the pretense of picking up another vehicle.  When she protested being taken there, Loggins assured her that everything was okay.  Of course, it wasn't.  Once they arrived in the wooded area where the truck was located and got out of the car, Loggins and the three other men began drinking again.  One of them hit Deblieux in the head with a beer bottle.  She tried to run away, but they tackled her.  As she lay on the ground, Loggins and the other men kicked Deblieux all over her body, over and over again.  When they realized that she was still alive despite the vicious beating they had inflicted on her, Loggins stood on her throat until she gurgled up blood.  She finally said "Okay, I'll party."  Then she died.

Loggins and the other men threw Deblieux's body into the back of their pickup truck, and drove to Bald Rock Mountain in adjacent St. Clair County, Alabama.  Once there, they removed all of Deblieux's clothes.  After playing with her naked corpse for awhile, they tossed it over the side of a cliff.  Loggins and the

3

others then left and went to a car wash in a nearby town.  There they washed the blood out of the truck and rummaged through Deblieux's luggage before scattering it in the woods near the car wash.

Later that night, Loggins and two of the other men returned to Bald Rock Mountain and defiled Deblieux's body.  They cut off her fingers, and they removed one of her teeth, and they cut out her left lung.  According to Loggins, that was not all that they did.  He later bragged to some friends that he and one of the other men had removed part of Deblieux's heart, taken a bite out of it, and "spit it into her face."  Loggins' desecration of his innocent victim's body was consistent with some of his other behavior:  he was involved with a "skinhead group," he sometimes slept in a cemetery, and he carried around a black notebook in which he indicated his fascination with death, dying, and "Satan worship."

The morning after the murder Loggins' girlfriend and another woman were looking for him.  They found him and two of his friends asleep in a pickup truck in the parking lot of a fast food restaurant.  All three men were covered in blood and mud.  When asked what they had been doing, Loggins replied that they "had killed a dog or something that was chasing [his] truck."

On February 26, 1994, a group of hikers on Bald Rock Mountain discovered Deblieux's mutilated body and called the police.  The body was taken to the

4

medical examiner's office, where a full autopsy was conducted. The autopsy revealed that Deblieux's face was covered with lacerations, every bone in her face was fractured at least once, almost every bone in her skull was fractured, a tooth was missing, her left eye was collapsed, her right eye had hemorrhaged, there were two large incisions in her chest, her left lung had been removed, she had 180 post-mortem stab wounds, and all of her fingers and both thumbs had been cut off.

In the weeks following the murder, when Loggins and the other three murderers "seem[ed] bored," they "would kind of jokingly say let's go pick up a hitchhiker" and allude to other facts of their crime. A member of the group showed a friend of his one of Deblieux's severed fingers, which he had been keeping in a ziplock bag. That led to the arrest of all four of those who had participated in Deblieux's murder.

## II.

This is Loggins' appeal from the district court's denial of his 28 U.S.C. § 2254 petition seeking relief from the life without parole sentence, which was eventually imposed on him after he was convicted for the crime of murder during the course of a kidnapping in the first degree, in violation of Alabama Code § 13A-5-40(a)(1). Loggins presses three claims concerning his sentence, but before we address them we have to address two preliminary matters. The first one is

5

whether those three claims are procedurally barred. The second one is whether the three claims were, in the language of the habeas statute, "adjudicated on the merits in State court proceedings" and thus are subject to the deferential standard of review prescribed by the Anti-Terrorism and Effective Death Penalty Act of 1996. See 28 U.S.C. § 2254(d). Both questions implicate the complicated procedural history of this case, which we will need to set out in some detail, especially to answer the second question.

## A.

On August 5, 1994, a grand jury in Jefferson County, Alabama, indicted Loggins on two counts of capital murder. Loggins v. State, 771 So. 2d 1070, 1074 (Ala. Crim. App. 1999). Count I charged him under Alabama Code § 13A-5-40(a)(1) with the capital offense of murder committed during the course of a kidnapping. Loggins, 771 So. 2d at 1074. Count II charged him under Alabama Code § 13A-5-40(a)(2) with the capital offense of murder committed during the course of a robbery. A jury found Loggins guilty of capital murder, as charged in Count I. Loggins, 771 So. 2d at 1074. The jury did not find him guilty of capital murder as charged in Count II, but instead on that count it convicted him of the lesser included offense of intentional but non-capital murder under Alabama Code § 13A-6-2(a)(1). Loggins, 771 So. 2d at 1074. The jury voted 10 to 2 to

6

recommend that Loggins be sentenced to death for his conviction under Count I. Id. Agreeing with the jury's recommendation, the trial court sentenced Loggins to death for his conviction under Count I. It also sentenced him to life in prison (with parole eligibility) for his conviction on the lesser included offense of non-capital murder under Count II. Id.

Four years later the Alabama Court of Criminal Appeals affirmed Loggins' capital murder conviction and death sentence under Count I, but the Court vacated his conviction and life sentence for intentional murder under Count II because it was for the same conduct that was being punished under Count I. Id. at 1092–93. On June 2, 2000, the Alabama Supreme Court affirmed the decision of the Court of Criminal Appeals. Ex parte Loggins, 771 So. 2d 1093 (2000). That concluded Loggins' direct appeal of his capital conviction and sentence.

On August 29, 2001, Loggins filed in the state trial court a timely "Petition for Relief from Judgment" under Rule 32 of the Alabama Rules of Criminal Procedure. In that petition he raised numerous claims, including some for ineffective assistance of counsel and one claim that imposing the death penalty on a person who was seventeen years old at the time of his crime violated "the Treaty and International Law Obligations of the United States and the State of Alabama."

After the State filed a response, the trial court summarily denied Loggins' Rule 32 petition on December 10, 2001.

At this point the procedural history becomes somewhat convoluted. In May 2002, some six months after his Rule 32 petition had been denied, Loggins filed a motion with the trial court asking it to vacate and then reissue its December 10, 2001 order denying his petition. Loggins v. State, 910 So. 2d 146, 148 (Ala. Crim. App. 2005). Loggins' motion claimed that he had been unaware that his Rule 32 petition had been denied until the State notified him of the fact in May 2002, which was too late for him to file a timely appeal of the denial order. Id. The trial court granted Loggins' motion on May 28, 2002. On that same date it issued an order that vacated its December 10, 2001 denial order, and immediately reissued another denial order. Id. The reason Loggins sought a new denial order, and the reason that the sympathetic trial court gave him one, was to make it more likely that the appellate courts would treat Loggins' belated notice of appeal as timely. With that in mind on June 4, 2002 Loggins filed a notice of appeal from the (new) denial of his Rule 32 petition, and he filed an amended notice of appeal from it on June 25, 2002. Id.

The reissuance tactic did not work. Loggins' appeal from the denial of his Rule 32 petition was dismissed three years later when the Alabama Court of

Criminal Appeals determined that the trial court had been without jurisdiction to vacate and reissue its order denying the petition. Id. The Court of Criminal Appeals' opinion did, however, suggest another way in which Loggins could obtain appellate review of the denial of his Rule 32 petition. Pointing to Marshall v. State, 884 So. 2d 900 (Ala. 2003), the Court explained that "the proper avenue for seeking an out-of-time appeal from the denial of a Rule 32 petition when the petitioner did not receive notice of the denial is by filing a petition for a writ of mandamus with [the Court of Criminal Appeals]." Loggins v. State, 910 So. 2d at 150–51.

In a special concurring opinion, Judge Shaw also recognized that a recent development in the law would affect the resolution of the Rule 32 petition. See id. at 154 (Shaw, J., concurring specially). That development was the decision in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183 (2005), which had come out just ten days earlier. The Supreme Court held in Roper that it is unconstitutional to execute criminals who were under eighteen at the time they committed their crimes. Id. at 578–79, 125 S.Ct. at 1200. As Judge Shaw pointed out, as a result of that decision, Loggins' death sentence was due to be vacated. Loggins v. State, 910 So. 2d at 154.

Following the procedural suggestion of the Court of Criminal Appeals, Loggins filed a petition for a writ of mandamus in that court, which of course granted the petition that it had invited and directed the trial court to set aside (yet again) and then reissue (yet again) its order denying Loggins' Rule 32 petition. On April 22, 2005, the trial court did as instructed, and on May 6, 2005 Loggins filed a timely notice of appeal from the trial court's re-denial of his Rule 32 petition.

In that appeal Loggins presented to the Court of Criminal Appeals three categories of contentions: one aimed at his death sentence, one aimed at his conviction, and one aimed at the way his Rule 32 post-conviction proceedings had been conducted. First, Loggins contended that his death sentence must be vacated under the Roper decision. Second, he contended that his capital conviction must be reversed because Roper also "establishe[d] that [he] was incapable of forming the requisite intent for capital murder under Alabama law." Closely connected to that argument was his related assertion that Roper revealed that he had been "improperly tried before a death-qualified jury," which he asserted as another ground for reversing his conviction. Third, Loggins contended that the trial court had improperly dismissed his Rule 32 petition without conducting a hearing and without allowing him an opportunity to cross-examine witnesses who had

10

submitted affidavits as part of the State's motion to dismiss. Loggins' brief concluded by asking the appellate court to vacate both his conviction and his death sentence, or in the alternative to vacate the denial of his Rule 32 petition and remand the case to the trial court for discovery and a full evidentiary hearing on his petition.

The State's brief in response argued that the proper procedural path for Loggins to obtain Roper relief from his capital sentence was for him to file a successive Rule 32 petition in the trial court. With respect to the other two issues in Loggins' brief, the State challenged his argument that Roper undermined his conviction or somehow established that he was incapable of forming the requisite intent for capital murder under Alabama law. The State pointed out that Roper addressed "solely . . . the issue of sentencing" and argued that Loggins' claim with respect to his conviction was therefore "meritless." As for his argument that he should be given an evidentiary hearing on his Rule 32 petition, the State contended that Loggins had not met his burden to show that he was entitled to one.

In Loggins' reply brief he rehashed the arguments that he had made in his initial brief, contending again that Roper required not only that his death sentence be set aside but also that his capital conviction be overturned because, he insisted,

"the Supreme Court made clear in [Roper] that juveniles are incapable of forming the requisite intent to commit a capital crime."

On December 8, 2005, the Alabama Court of Criminal Appeals issued a two-page order remanding the case to the trial court with specific instructions for that court "to vacate Loggins's death sentence and to resentence Loggins to life imprisonment without the possibility of parole." Loggins v. State, No. CR-04-1567 (Ala. Crim. App. Dec. 8, 2005) (order remanding to trial court for resentencing). In its order the Court of Criminal Appeals dismissed any concern about Loggins having raised his Roper-based claim for the first time on appeal, pointing out that it had already held that Roper applied retroactively to cases on collateral review and that it was "well settled that the legality of a sentence is a jurisdictional matter that may be challenged at any time and that may be noticed by this Court at any time." Id. That quoted statement will be important later in our discussion.

Just one week after the Court of Criminal Appeals issued its order, Loggins filed in the trial court what he styled a "Motion for Sentencing Hearing" in which he for the first time claimed that sentencing him to life imprisonment without parole would itself be unconstitutional. Loggins asked the trial court to conduct a

12

full hearing before resentencing him. Specifically, Loggins stated his intent to offer evidence and argue at that hearing:

> [1.] that imposition of a life sentence without the possibility of parole for a crime committed as a juvenile, is cruel and unusual punishment prohibited by the Eighth Amendment of the United States Constitution, the analogous provisions of the Alabama Constitution, as well as multiple international laws and treaties[;] . . . .
>
> [2.] . . . that the automatic imposition of life without parole violates Mr. Loggins' procedural due process rights as well as his Sixth Amendment right to a jury[; and] . . . .
>
> [3.] . . . that [Roper] itself forbids juveniles convicted in Alabama from being sentenced to life without parole. Under Alabama law, the death penalty and life without parole are punishments statutorily reserved for commission of "capital murder." If a jury convicts a defendant for the next highest degree of homicide—"murder"—the most severe penalty he can receive is life imprisonment with parole. Given [Roper's] holding that juveniles are incapable of forming the requisite intent to commit capital murder—and in Alabama, a death sentence and life without parole share the same requisite intent element—[Roper] establishes that an Alabama juvenile cannot form the requisite intent to be punished with life without parole.

(citations omitted). Following up on his motion, on January 23, 2006 Loggins filed in the trial court a "Brief in Support of a Full and Fair Sentencing Hearing and a Valid, Constitutional Sentence." In that brief Loggins contended that the "fundamental issue" the case now presented was "whether [the trial court] must follow the literal mandate issued by the Court of Criminal Appeals and impose an unconstitutional sentence of life without the possibility of parole" or whether the

13

trial court had "a duty and responsibility, as the trier of fact and the court of first impression, to consider appropriate facts and legal argument before imposing a sentence that may be invalid under both state and federal law." Loggins asked the court to provide him with a full sentence hearing and afterwards to "impose a constitutionally permissible sentence of life imprisonment with the possibility of parole."

The trial court conducted a limited sentence hearing on January 27, 2006. It began the hearing by acknowledging both the request in Loggins' brief that the court consider "a sentence of life as opposed to life without parole" and also the State's response "objecting to any sentence other than life without the possibility of parole."

Loggins asserted that he should receive a lesser sentence because he was not "death-eligible," because the State "should never have charged him with a capital offense" and because he "should never have been tried before a jury that was death-qualified." He argued:

> [F]or the same reasons that the Supreme Court reversed the [capital] sentence in Roper v. Simmons, those very same reasons make it unconstitutional for this Court to sentence Mr. Loggins to life without the possibility of parole and sentence him to a mandatory sentence of life without the possibility of parole.

And we are prepared . . . to submit evidence on that issue. We believe that under Alabama law and under the Constitution, the maximum that Mr. Loggins can be sentenced to as a first offender is the maximum that he could be sentenced for the crime of murder, which is a lesser included offense under the capital offense statute, and that anything that exceeds that maximum would be impermissible as a matter of law.

He also argued that:

Roper stands for the proposition that juveniles cannot be prosecuted capitally. They do not have the requisite intent to be prosecuted capitally. The Supreme Court said they have insufficient—these are the words—insufficient, lesser, diminished culpability. Those are the phrases that they use, and that negates the intent required for a capital offense.

Loggins then stated that he "had three experts, all renowned, prepared to testify why a harsh and irreversible mandatory sentence of life without parole for a juvenile, and for [him] in particular, would not be appropriate." Loggins then described those experts and offered a synopsis of what each would have said.

First, he stated that he was prepared to offer "a psychiatrist who has been involved in the study of adolescent brain development" and who would present "the overwhelming scientific evidence that the region of the human brain that regulates important functions as impulse control and moral judgment does not fully mature until a person reaches the early twenties." He characterized that evidence as "the underpinning for the Supreme Court's decision in Roper v.

15

Simmons" and asserted that it "applie[d] specifically to this case and this crime." Second, Loggins said that he was prepared to call a criminologist who was "an expert in the field of . . . juvenile criminal behavior" and who "was prepared to testify that . . . Mr. Loggins represents what he calls the poster child for rehabilitation, which a life without a parole sentence totally negates." According to Loggins, that criminologist would discuss "the circumstances of the incident offense and how they are generally consistent with juvenile criminal behavior that is unlikely to persist beyond a certain age." Finally, he was prepared to call "a local psychologist . . . to testify that based on his psychological evaluation of Mr. Loggins, that the person [the court] [was] sentencing today bears little resemblance to the person who was convicted of the crime over twelve years ago." The testimony would reveal "that Mr. Loggins has matured into a reformed, caring adult capable of developing significant personal detachments [sic?], resisting negative influences, and controlling violent or aggressive impulses." Furthermore, the psychologist would testify about Loggins' dramatically increased verbal IQ, his ability to show "genuine empathy for others," and his "profound shame for his role in the underlying offense."

After listening to Loggins' proffer, the trial court specifically disagreed with the assertion that "Roper v. Simmons says that a juvenile can't form the requisite intent." The court explained:

> I think you equate [the Supreme Court's] use of the word "culpability" with intent, which I think are two completely different things. I think the Supreme Court to me is saying that a juvenile should not be held as culpable as an adult, not that they can't form the requisite intent.

The court pointed out that under Loggins' reasoning a juvenile could not be found guilty of any type of murder or any specific intent crime. "[T]he argument can go all the way down to, well, he should just be found guilty of manslaughter," the court reasoned, "and be getting a two- to twenty-year sentence."

The court then allowed the State to respond to Loggins' arguments. The State agreed with the court's conclusion that Roper did not address the intent element of a capital murder, that it did not hold that a juvenile was unable to form the intent necessary for that crime. "A juvenile can still be charged with capital murder," the State argued, "the only difference here is death is no longer an available punishment; however, life without parole is." The State also argued that the nature of the remand from the Court of Criminal Appeals was limited and that the trial court had been ordered to resentence Loggins to life without parole.

The trial court then announced its decision. It stated first of all that it agreed with the State's argument that the remand from the Court of Criminal Appeals had been "a very specific remand," instructing it to sentence Loggins to life without parole. But the important point is that the trial court did not stop there. It alternatively denied Loggins' Roper claims on the merits, stating:

> [E]ven if I thought that the remand didn't prevent me from imposing a lesser sentence, I do not believe that the sentence of life without parole is unconstitutional. I have reviewed the brief that you filed and some of the cases in the brief. I pulled and read all those. But I don't think it's an unconstitutional sentence . . . .

The court then sentenced Loggins to life without parole and told him that he had the right to appeal his new sentence.

Loggins did appeal, filing his notice of appeal on February 3, 2006, and on March 10, 2006 he filed in the Court of Criminal Appeals a "Memorandum of Law in Opposition to Appellant's New, Unconstitutional Sentence of Life Without Parole." That memorandum presented and argued the following contentions:

> 1. Roper v. Simmons and Alabama state law require this Court to vacate [Loggins'] unconstitutional sentence of life without parole.
>
> 2. Sentencing a juvenile to life without the possibility of parole constitutes cruel and unusual punishment.
>
> 3. The [trial] court erred by not permitting Kenney Loggins to present expert testimony during his sentencing hearing.

18

On April 21, 2006, the Court of Criminal Appeals issued both an order, Loggins v. State, No. CR-05-0815 (Ala. Crim. App. Apr. 21, 2006) (mem.), and an unpublished memorandum opinion, Loggins v. State, No. CR-04-1567 (Ala. Crim. App. Apr. 21, 2006) (unpublished memorandum opinion). The order dismissed Loggins' appeal of his new sentence of life without parole on the ground that the appellate court lacked jurisdiction over an appeal from a sentence alone, as distinguished from an appeal of a conviction or of both a conviction and sentence.[1] See Ala. Code § 12-22-130 ("A person convicted of a criminal offense in the circuit court or other court from which an appeal lies directly to the Supreme Court or Court of Criminal Appeals may appeal from the judgment of conviction to the appropriate appellate court.").

The Court of Criminal Appeals' April 21, 2006 memorandum opinion did affirm the trial court's order insofar as it denied Loggins' Rule 32 petition, and in doing so the appellate court focused primarily on the claims that Loggins had originally raised in that petition, including his many claims of ineffective

---

[1] The court's dismissal order cited one of its earlier decisions, Hart v. State, 939 So. 2d 948 (Ala. Crim. App. 2005), which also involved a juvenile who was originally sentenced to death but whose death sentence had been vacated following Roper. On remand and at the State's request, Hart had been sentenced to life without parole, and he had appealed that new sentence to the Court of Criminal Appeals. The Court of Criminal Appeals had decided that it lacked jurisdiction over Hart's appeal because "[t]he right of appeal is wholly statutory" and "[a]ppeals lie only from judgments of conviction." Id. at 950 (quotation marks omitted).

19

assistance of counsel. <u>Loggins</u>, No. CR-04-1567, at 15–67. But those original petition claims were not the only ones discussed and decided. On the third page of its memorandum opinion, the Court of Criminal Appeals recognized the unusual procedural posture of the case in light of the Supreme Court's intervening decision in <u>Roper</u>. <u>Id.</u> at 3. It noted that the case had already been remanded to the trial court with instructions for that court "to vacate Loggins's death sentence and to resentence Loggins to life imprisonment without the possibility of parole because Loggins was 17 years old at the time of the crime and, therefore, his death sentence was illegal." <u>Id.</u> To the end of that statement the court attached an important footnote. In that footnote, numbered 3, the court explained that "[a]n illegal or void sentence may be challenged at any time," and it cited to Alabama decisional law for that proposition. <u>Id.</u> at 3 n.3.

Back in the text of its opinion the Court then recounted that "[t]he [trial] court complied with our instructions and resentenced Loggins to life without parole on January 27, 2006." <u>Id.</u> at 3. But attached to that statement was footnote 4, in which the Court elaborated:

> In his brief to this Court, Loggins argues that the United States Supreme Court's holding in <u>Roper</u> also mandates that his capital-murder conviction be vacated because, he says, he could not have formed the intent to kill and he was harmed by being tried by a death-qualified jury. Neither of these claims were included in Loggins's petition; therefore,

they are not properly before this Court for review.  See e.g., Arrington v. State, 716 So. 2d 237, 239 (Ala. Crim. App. 1997) ("An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.").  Moreover, the sole holding in Roper was that a juvenile defendant could not be sentenced to death.  The Court did not hold that juvenile defendants could not form the requisite intent to kill necessary for capital murder or could not be convicted of capital murder, and Loggins's argument to the contrary is meritless on its face.

Id. at 3 n.4.  The next to the last quoted sentence—the "Moreover" sentence—is important to the issues before us, as we will explain later.

After the Court of Criminal Appeals ruled against him, Loggins filed on May 5, 2006 two applications for rehearing, one seeking to alter that Court's April 21, 2006 order and the other seeking to alter its memorandum opinion of the same date.  Each application was also accompanied by a supporting memorandum of law.  In those applications and memoranda, Loggins argued, among other things, that the Court of Criminal Appeals' opinion had not acknowledged his earlier memorandum of law opposing his new sentence of life without parole.  He asserted that the Court had not "address[ed] any of the facts or legal arguments" contained in that earlier memorandum.  One week later the Court of Criminal Appeals denied without discussion both of Loggins' applications for a rehearing.

On May 26, 2006, Loggins filed timely petitions for writ of certiorari in the Alabama Supreme Court seeking review of the Court of Criminal Appeals'

21

decision affirming the denial of his Rule 32 petition and of that court's dismissal of his direct appeal from his life without parole sentence. Loggins argued in his petitions to the Alabama Supreme Court that "[a]lthough the Court of Criminal Appeals appropriately instructed the [trial court] to reverse Mr. Loggins' unconstitutional death sentence . . . the court erroneously upheld the [trial court's] new sentence of life without the possibility of parole." "The decisions of the courts below were in error," he insisted, "because Mr. Loggins' new sentence of life without the possibility of parole must likewise be reversed under the Roper precedent." The Alabama Supreme Court denied Loggins' petitions for certiorari on August 11, 2006.

Meanwhile, on June 5, 2006 Loggins had filed in federal district court a petition for writ of habeas corpus under 28 U.S.C. § 2254. The district court denied the petition on May 27, 2009, but in a later order that court granted Loggins a certificate of appealability on the following three issues:

1. [W]hether the rationale of Roper renders sentencing juveniles to life without parole unconstitutional under the Eighth Amendment.

2. [W]hether Roper renders Alabama's practice of charging juveniles with capital offenses unconstitutional under the Eighth Amendment.

3. [W]hether, after Roper, the automatic resentencing and the denial of a sentencing hearing to Mr. Loggins violated the Eighth Amendment and Mr. Loggins' right to due process.

22

## B.

We turn first to the preliminary question of whether a procedural bar applies to any of the claims before us. The short answer is that it does not matter. When relief is due to be denied even if claims are not procedurally barred, we can skip over the procedural bar issues, and we have done so in the past. See Valle v. Sec'y, Dep't of Corr., 459 F.3d 1206, 1213 (11th Cir. 2006) ("Here, it is unnecessary to address the issue of the procedural bar, because even assuming the claim is preserved, Valle is not entitled to habeas relief."); see also Bell v. Cone, 543 U.S. 447, 451, 451 n.3, 125 S.Ct. 847, 850 n.3 (2005) (declining to address whether the court of appeals correctly held that the petitioner had not defaulted on his claim and citing 28 U.S.C. § 2254(b)(2) for the proposition that "an application for habeas corpus may be denied on the merits, notwithstanding a petitioner's failure to exhaust in state court"); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[A]ppeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar."); see generally 28 U.S.C. § 2254(b)(2) ("An application for a writ

23

of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

C.

The second preliminary question is an important one that we will answer. That question is whether Loggins' claims were adjudicated on the merits in the state court proceedings. The Anti-Terrorism and Effective Death Penalty Act provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d). Recent decisions from both this Court and the Supreme Court have clarified what it means for a claim to be "adjudicated on the merits in State court proceedings."

In Harrington v. Richter, ___U.S. ___, 131 S.Ct. 770 (2011), the Supreme Court addressed whether § 2254(d) applies even if the state court's denial of relief is "without an accompanying statement of reasons." Id. at 780. The petitioner in Harrington was convicted in California state court and sentenced to life without

parole. Id. at 782. After his convictions and sentence were affirmed on direct

appeal, he sought state habeas relief in the California Supreme Court, asserting

various claims. Id. at 782–83. That court denied his petition "in a one-sentence

summary order," and the petitioner then turned to federal court. Id. at 783. The

district court denied his federal habeas petition, but in the course of reversing the

denial of relief the en banc Ninth Circuit questioned whether § 2254(d) deference

applied to the petitioner's claims when the California Supreme Court had entered

only a summary denial of those claims. Id. Reversing the Ninth Circuit's

decision, the United States Supreme Court made clear that § 2254(d) deference did

apply in that situation:

> By its terms § 2254(d) bars relitigation of any claim "adjudicated on the merits" in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2). There is no text in the statute requiring a statement of reasons. The statute refers only to a "decision," which resulted from an "adjudication." As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning. And as this Court has observed, a state court need not cite or even be aware of our cases under § 2254(d). Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.

Id. at 784 (citations omitted). The Supreme Court also emphasized that a state court need not say that it was adjudicating a petitioner's claim on the merits in order for § 2254(d) to be applicable to those claims in federal habeas review:

> There is no merit either in [petitioner's] argument that § 2254(d) is inapplicable because the California Supreme Court did not say it was adjudicating his claim "on the merits." The state court did not say it was denying the claim for any other reason. When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.

Id. at 784–85. The presumption that a state court has adjudicated a claim on the merits may be overcome, the Court explained, only "when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785. The burden of making that showing is on the petitioner. See id.

The Supreme Court in Harrington cited favorably this Court's decision in Wright v. Secretary for the Department of Corrections, 278 F.3d 1245 (11th Cir. 2002), where we reached exactly the same conclusion about the requirements of § 2254(d). See Harrington, 131 S.Ct. at 784. We explained in Wright:

> A judicial decision and a judicial opinion are not the same thing. The chief responsibility of judges is to decide the case before them. They may, or may not, attempt to explain the decision in an opinion. The text of § 2254(d)(1) accepts this orthodox view. The statutory language focuses on the result, not on the reasoning that led to the result, and nothing in that language requires the state court adjudication that has

26

> resulted in a decision to be accompanied by an opinion that explains the state court's rationale. Accordingly, all that is required is a rejection of the claim on the merits, not an explanation.

Wright, 278 F.3d at 1255 (citations omitted). We also noted in Wright that our interpretation of § 2254(d)(1) was consistent with the "main thrust" of the AEDPA amendments, which "were intended to require greater federal court deference to state court decisions and to promote more federal-state judicial comity." Id. "Requiring state courts to put forward rationales for their decisions so that federal courts can examine their thinking" we observed, "smacks of a 'grading papers' approach that is outmoded in the post-AEDPA era." Id.

This Court's recent en banc decision in Childers v. Floyd, 642 F.3d 953 (11th Cir. 2011) (en banc), re-emphasized the holdings of both the Harrington and Wright cases and their broad definition of the term "adjudication on the merits" in § 2254(d)(1). Id. at 968. We explained in Childers that "[d]eference to the autonomy and dignity of the state courts underlies this broad definition," and we held that "an 'adjudication on the merits' is best defined as any state court decision that does not rest solely on a state procedural bar." Id. As a result, "unless the state court clearly states that its decision was based solely on a state procedural rule, we will presume that the state court has rendered an adjudication on the

merits when the petitioner's claim is the same claim rejected by the state court."
Id. at 969 (quotation marks omitted).

Our case law also makes clear that we accord AEDPA deference not only to the adjudications of state appellate courts but also to those of state trial courts that have not been overturned on appeal. See, e.g., Hammond v. Hall, 586 F.3d 1289, 1330–32 (11th Cir. 2009) (explaining in the context of a petitioner's ineffective assistance of counsel claim that "where a state trial court rejects a claim on one prong of the ineffective assistance of counsel test and the state supreme court, without disapproving that holding, affirms on the other prong, both of those state court decisions are due AEDPA deference," id. at 1332); Atwater v. Crosby, 451 F.3d 799, 807 (11th Cir. 2006) ("[G]iven the great deference afforded the determinations of state courts under § 2254, we cannot reach the conclusion that the trial court or the Florida Supreme Court unreasonably applied Batson[ v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986),] in this case."); cf. Hannon v. Sec'y, Dep't of Corr., 562 F.3d 1146, 1150 (11th Cir. 2009) (noting that AEDPA deference to the fact findings of state courts "applies to fact findings made by both state trial courts and state appellate courts").

Loggins contends that the claims he presents to us have not been adjudicated on the merits in state court. His argument discounts the state trial

28

court's decision and focuses on the April 2006 opinion and order of the Court of Criminal Appeals. He argues that neither the appellate court's 68-page opinion affirming the denial of his Rule 32 petition nor its one-page order dismissing the appeal of his sentence explicitly addressed his claims that a sentence of life without parole for a juvenile is unconstitutional, that charging a juvenile with a capital offense is unconstitutional, or that he should have been allowed to present mitigating evidence at his resentencing.

Loggins acknowledges, as he must, that footnote 4 of the Court of Criminal Appeals' opinion did address two Roper-based claims he had raised in his July 1, 2005 brief to that court: his claim that Roper meant that his conviction for capital murder must be overturned because juveniles could not form the requisite intent to commit capital murder, and his claim that under Roper he could not be charged or convicted of capital murder. Of course, when he filed that July 2005 brief Loggins was still under a sentence of death and the case had not yet been remanded to the trial court for him to be resentenced to life without parole. By the time the Court of Criminal Appeals issued its April 21, 2006 opinion, however, Loggins had been resentenced to life without parole and was contesting the validity of that sentence. The full text of footnote 4 of that opinion reads:

29

In his brief to this court, Loggins argues that the United States Supreme Court's holding in <u>Roper</u> also mandates that his capital-murder conviction be vacated because, he says, he could not have formed the intent to kill and he was harmed by being tried by a death-qualified jury. Neither of these claims were included in Loggins's petition; therefore, they are not properly before this Court for review. <u>See, e.g.</u>, <u>Arrington v. State</u>, 716 So. 2d 237, 239 (Ala. Crim. App. 1997) ("An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition."). <u>Moreover, the sole holding in Roper was that a juvenile defendant could not be sentenced to death.</u> The Court did not hold that juvenile defendants could not form the requisite intent to kill necessary for capital murder or could not be convicted of capital murder, and Loggins's argument to the contrary is meritless on its face.

<u>Kenneth Loggins v. State of Alabama</u>, No. CR-04-1567, at 3 n.4 (Ala. Crim. App. Apr. 21, 2006) (unpublished memorandum opinion) (emphasis added).

Loggins argues that the Court of Criminal Appeals "all but ignored" the <u>Roper</u> claims he later raised in both the trial court and in his "Memorandum of Law in Response to New Sentence of Life Without Parole," which he filed with the Court of Criminal Appeals on March 10, 2006, more than a month before that court issued its opinion and order. On that basis he contends that those claims were not "adjudicated on the merits in State court proceedings" and therefore are not subject to the deferential standard of review required by § 2254(d)(1). <u>See</u> 28 U.S.C. § 2254(d).

30

Loggins' argument is flawed. For one thing, when the state trial court resentenced Loggins to life without parole on January 27, 2006, it did adjudicate these claims on the merits. The transcript of that proceeding reveals that Loggins contested the constitutionality of a sentence of life without parole for a juvenile, argued that "Roper stands for the proposition that juveniles cannot be prosecuted capitally," objected to being automatically resentenced to life without parole, and made a proffer of the mitigating evidence he would have presented if the court had conducted a full sentence hearing. Those arguments are in essence, although not in precisely the same words, the arguments that Loggins is making before us now. And the trial court rejected all of those arguments when it sentenced Loggins to life without parole without allowing him to present mitigating circumstances.[2] Because that rejection of the claims on the merits was not disturbed on appeal, § 2254(d)(1) deference applies. See Hammond, 586 F.3d at 1330–32.

Even if the state trial court had not adjudicated Loggins' claims on the merits in sentencing him to life without parole, § 2254(d)(1) deference would still apply because of what happened to those claims in the Court of Criminal Appeals

---

[2] After it heard all of Loggins' arguments and his proffer of mitigating circumstances evidence, the state trial court rejected his position on the merits with these words: "So even if I thought that the remand didn't prevent me from imposing a lesser sentence, I do not believe that the sentence of life without parole is unconstitutional. I have reviewed the brief that you have filed and some of the cases in the brief. I pulled and read all those. But I don't think it is an unconstitutional sentence."

in Loggins' appeal from the denial of his Rule 32 petition attacking his life without parole sentence. In that appeal Loggins made to the Court of Criminal Appeals essentially the same <u>Roper</u>-based arguments that he has made in this Court. In a memorandum of law he made the following contentions, all of which are premised on <u>Roper</u>:

> 1. "<u>Roper v. Simmons</u> and Alabama state law require this court to vacate [Loggins'] unconstitutional sentence of life without parole."

> 2. "Sentencing a juvenile to life without the possibility of parole constitutes cruel and unusual punishment."

> 3. "The circuit court erred by not permitting Kenney Loggins to present expert testimony during his sentence hearing."

(capitalization altered). Thereafter, the Court of Criminal Appeals affirmed the trial court's dismissal of Loggins' Rule 32 petition. <u>Loggins,</u> No. CR-04-1567. In its opinion the appellate court noted that Loggins' death sentence had already been vacated and a new sentence of life without parole imposed, and it held that "[a]n illegal or void sentence may be challenged at any time." <u>Id.</u> at 3 & n.3. The appellate court also clearly stated an alternative ground for rejecting Loggins' claims that he could not be convicted of a capital offense in light of <u>Roper</u>. The alternative ground it stated was that "the sole holding in <u>Roper</u> was that a juvenile defendant could not be sentenced to death." <u>Id.</u> at 3 n.4. That alternative holding

32

on the merits about the limitations of the <u>Roper</u> holding disposes of all of Loggins'

claims.

So, after the trial court had ruled, in the alternative, that Loggins' claims

were without merit, the Court of Criminal Appeals, recognizing that "[a]n illegal

or void sentence may be challenged at any time," decided the claims on the merits.

It rejected Loggins' claims, all of which were tied to the <u>Roper</u> decision, because it

concluded that "the sole holding in <u>Roper</u> was that a juvenile defendant could not

be sentenced to death."[3]  What the Court of Criminal Appeals did is enough to be

an "adjudication on the merits" within the meaning of § 2254(d).  As <u>Harrington</u>,

<u>Wright</u>, and <u>Childers</u> make clear, the Court of Criminal Appeals did not need to

acknowledge Loggins' claims about his life without parole sentence, or to

expressly state it was adjudicating those claims on the merits, or to give reasons

why those claims lacked merit.  "When a federal claim has been presented to a

state court and the state court has denied relief, it may be presumed that the state

court adjudicated the claim on the merits in the absence of any indication or state-

law procedural principles to the contrary."  <u>Harrington</u>, 131 S.Ct. at 784–85.  Or,

as we explained in <u>Childers</u>, "unless the state court clearly states that its decision

---

[3] Loggins filed an application for rehearing in the Court of Criminal Appeals, which was denied.  <u>See</u> <u>supra</u> at 21–22.

was based solely on a state procedural rule, we will presume that the state court has rendered an adjudication on the merits when the petitioner's claim is the same claim rejected by the state court." 642 F.3d at 969 (quotation marks omitted). Any notion that the Court of Criminal Appeals relied on a procedural bar in rejecting Loggins' claims about his life without parole sentence is foreclosed by its statement that "[a]n illegal or void sentence may be challenged at any time." Loggins, No. CR-04-1567, at 3 n.3. At the least, and the least is all that is required in this area of the law, the appellate court did not "clearly state[] that its decision was based solely on a state procedural rule." Childers, 642 F.3d at 969.

For all of these reasons, we owe § 2254(d)(1) deference to the state trial and appellate court decisions that Loggins' life without parole sentence, and the procedures under which it was imposed, are not unconstitutional in light of the Roper decision.

## III.

There are no factual disputes in this case. The claims present purely legal issues, and under § 2254(d)(1) we are concerned only with whether the state court decisions rejecting those claims were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court has

instructed that under that provision "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 786–87. Phrased a second way, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 2149 (2004)). Or phrased a third way, more simply and maybe a little more clearly: if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied. However it is phrased, the deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear. See id. ("If this standard is difficult to meet, that is because it was meant to be.").

## IV.

With that deferential standard in mind, we first consider whether the Supreme Court has clearly established that, regardless of the procedures used, any sentence of life without parole for someone who was a juvenile at the time he committed murder violates the Eighth Amendment's prohibition against cruel and

unusual punishment.[4] The primary basis for arguing that the Court has is the Roper decision and the decision in Graham v. Florida, ___U.S.___, 130 S.Ct. 2011 (2010). In an apparent attempt to get around § 2254(d)(1)'s deferential hurdle instead of clearing it, Loggins also argues that there is a "growing national consensus" and an already grown international consensus against sentencing a juvenile to life without parole even for a homicide crime, and that treaties preclude doing it.

A.

We begin with the Roper and Graham decisions, although it is not clear that we should be considering the 2010 decision in Graham in our determination of what was clearly established federal law at the time that the state courts' rejection of Loggins' claims became final in 2006. Under § 2254(d)(1) habeas relief is to be granted only when the state court judgment is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court has held that the phrase "clearly established Federal law" in § 2254(d)(1)

---

[4] Throughout this opinion, we use the term "juvenile" to mean someone who was under the age of eighteen years when he committed the crime for which he was sentenced. We do so because that is the definition the Supreme Court gave to the term for Graham and Roper purposes. See Graham, ___ U.S. at ___,130 S.Ct. at 2017–18; Roper, 543 U.S. at 574, 125 S.Ct. at 1197–99.

refers to "the governing legal principle or principles set forth by the Supreme Court <u>at the time the state court renders its decision</u>." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172 (2003) (emphasis added). And as we have recognized, "The content of the § 2254(d) unreasonable application test is drawn in large part from the <u>Teague</u> . . . nonretroactivity doctrine and the decisions explicating it," and "[u]nder <u>Teague</u> a new rule of criminal procedure generally may not be applied in a federal habeas proceeding where the judgment in question became final before the rule was announced." <u>Schwab v. Crosby</u>, 451 F.3d 1308, 1323 (11th Cir. 2006) (citation omitted); <u>see</u> <u>Teague v. Lane</u>, 489 U.S. 288, 109 S.Ct. 1060 (1989).

But the <u>Teague</u> non-retroactivity doctrine has two exceptions, and one of them fits the rule announced in <u>Graham</u>. The exception that fits is the one for new rules "prohibiting a certain category of punishment for a class of defendants because of their status or offense." <u>Penry v. Lynaugh</u>, 492 U.S. 302, 330, 109 S.Ct. 2934, 2953 (1989), <u>abrogated on other grounds by</u> <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S.Ct. 2242 (2002). The question is whether the exceptions to the <u>Teague</u> non-retroactivity doctrine survived the AEDPA amendments and live on in the partial codification of the doctrine that is § 2254(d)(1). <u>See</u> <u>generally</u> <u>Schwab</u>, 451 F.3d at 1322–24 (explaining the relationship between the <u>Teague</u> non-

retroactivity doctrine and § 2254(d)(1)). We have sidestepped that question before, see Grossman v. McDonough, 466 F.3d 1325, 1341 n.13 (11th Cir. 2006), and we are content to do so again because the answer will not affect the result in this case.

It will not affect the result because, even considering Graham along with Roper, "fairminded jurists" could conclude that it is constitutionally permissible to impose a life without parole sentence on a juvenile convicted of homicide. Or, recognizing that the burden is on Loggins, he cannot show that "there is no possibility fairminded jurists" could reach that conclusion. See Harrington, 131 S.Ct. at 786. There are a number of reasons that he cannot show that.

First, the Supreme Court has never held, or even stated in dicta, that the Constitution bars a life without parole sentence for a juvenile convicted of murder. Neither Roper nor Graham held or said that.[5] The holding of Roper is simply that

---

[5] Nor, if it mattered, has any other court. In every decision on point that we could find, courts faced with the issue have held that a life without parole sentence may constitutionally be imposed on a juvenile who commits murder. See, e.g., State v. Ninham, 797 N.W.2d 451, 463, 471 (Wis. 2011); State v. Andrews, 329 S.W.3d 369, 377–78 (Mo. 2010); Meadoux v. State, 325 S.W.3d 189, 196 (Tex. Crim. App. 2010); State v. Pierce, 225 P.3d 1146, 1147–48 (Ariz. Ct. App. 2010); State v. Martin, 773 N.W.2d 89, 97–99 (Minn. 2009); State v. Allen, 958 A.2d 1214, 1233–36 (Conn. 2008); Wallace v. State, 956 A.2d 630, 638–41 (Del. 2008); State v. Craig, 944 So. 2d 660, 664–65 (La. Ct. App. 2006).

While not controlling, those state decisions support the proposition that federal law is not clearly established to the contrary by Roper, Graham, or any other decision. See Price v. Vincent, 538 U.S. 634, 643 & n.2, 123 S.Ct. 1848, 1854 & n.2 (2003) (concluding that a state court decision was not an "objectively unreasonable application of clearly established law" based

"[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." Roper, 543 U.S. at 578, 125 S.Ct. at 1200. The decision in Graham is simply that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." Graham, 130 S.Ct. at 2034.

Loggins argues, in effect, that even if Roper and Graham did not actually hold that juveniles could not be sentenced to life without parole for murder, they did imply that. In fact and in law, neither decision does imply that, and it would not matter if they did. The Supreme Court has repeatedly held that only the actual holdings of its decisions can "clearly establish[]" federal law for § 2254(d)(1) purposes. See Carey v. Musladin, 549 U.S. 70, 74, 127 S.Ct. 649, 653 (2006) ("[C]learly established Federal law in § 2254(d)(1) refers to the holdings, as opposed to the dicta, . . . ." (quotation marks omitted)); Yarborough v. Alvarado, 541 U.S. 652, 660, 124 S.Ct. 2140, 2147 (2004) ("For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by this Court refers to the

in part on similar decisions by other state courts (emphasis omitted)); Leavitt v. Arave, 383 F.3d 809, 819 (9th Cir. 2004) (noting that the Supreme Court "does not ignore the experience of the lower courts as illuminating whether the rule contended for is a development in the law over which reasonable jurists could disagree" (quotation marks omitted) (citing Lambrix v. Singletary, 520 U.S. 518, 538, 117 S.Ct. 1517, 1530 (1997) ; Caspari v. Bohlen, 510 U.S. 383, 393–95, 114 S.Ct. 948, 955–56 (1994); Stringer v. Black, 503 U.S. 222, 236–37, 112 S.Ct. 1130, 1140 (1992); Butler v. McKellar, 494 U.S. 407, 415, 110 S.Ct. 1212, 1217–18 (1990).

39

holdings, as opposed to the dicta, . . . ." (quotation marks omitted)); Williams v. Taylor, 529 U.S. 362, 365, 120 S.Ct. 1495, 1499 (2000) ("[T]he phrase 'clearly established Federal law, as determined by [this] Court' refers to the holdings, as opposed to the dicta, . . . ."). Because implications are not actual holdings, the implications of Supreme Court decisions cannot clearly establish federal law for § 2254(d)(1) purposes anymore than dicta can.

But even if implications did count in the § 2254(d)(1) analysis, the Supreme Court did not imply in Roper or in Graham that a life without parole sentence is impermissible for a juvenile who commits a homicide. If anything, Roper implies that it is permissible. The Roper case involved a defendant whose sentencing situation was exactly like that of Loggins: the defendant was seventeen at the time he committed murder, and he was convicted and sentenced to death. 543 U.S. at 556, 125 S.Ct. at 1187. The state supreme court later vacated his sentence, reasoning that "a national consensus" had developed against sentencing juvenile offenders to death. Id. at 559, 125 S.Ct. at 1189. In the same opinion it resentenced the defendant to life imprisonment without parole. Id. at 559–60, 125 S.Ct. at 1189. That is materially identical to what happened in Loggins' case: he, too, was sentenced to death for a murder he committed when he was seventeen,

40

and he, too, was resentenced to life without parole. In <u>Roper</u> the Supreme Court affirmed the judgment of the state supreme court, which had vacated the defendant's death sentence and imposed a life without parole sentence. <u>Id.</u> at 560, 578–79, 125 S.Ct. at 1189–90, 1200 (noting that the state supreme court had "set aside [the defendant's] death sentence and resentenced him to 'life imprisonment without eligibility for probation, parole, or release except by act of the Governor,'" and stating: "We . . . now affirm."). The result of the Supreme Court's decision in <u>Roper</u> was to leave intact a life without parole sentence in a juvenile homicide case.

Not only that, but in the context of rejecting an argument that the death penalty for juveniles should be retained because of its deterrent effect, the Supreme Court used reasoning that unmistakably implies the validity of a life without parole sentence for a juvenile:

> As for deterrence, it is unclear whether the death penalty has a significant or even measurable deterrent effect on juveniles . . . . To the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person.

<u>Id.</u> at 571–72, 125 S.Ct. at 1196. In other words, the death penalty is not required to deter juveniles from committing murder because a life without parole sentence

41

is deterrence enough, particularly for a juvenile. The implication of Roper, then, is that a sentence of life without parole for a juvenile convicted of homicide is constitutional.

Nor does the Graham decision directly or indirectly, explicitly or implicitly, support Loggins' position. The Court's opinion in that case expressly states that the decision is limited to life without parole sentences imposed on juveniles for nonhomicide offenses. Graham, 130 S.Ct. at 2023 ("The instant case concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense."); see also id. at 2030 ("This Court now holds that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole."). In fact, the Graham opinion repeats the qualifying term "nonhomicide"—both as a noun and as an adjective modifying nouns like "offenders" and "crimes"—some 48 times. See id. at 2017–34. That pointed qualifier is strung like barbed wire throughout the opinion, fencing in the limited holding and fencing out any broader interpretation of it. And, if that were not enough, there is also this key passage in the Graham opinion in which the Court while discussing juvenile sentencing took pains to distinguish between homicide and nonhomicide crimes:

The Court has recognized that <u>defendants who do not kill, intend to kill, or foresee that life will be taken</u> are categorically less deserving of the most serious forms of punishment than are murderers. <u>There is a line "between homicide and other serious violent offenses against the individual."</u> <u>Serious nonhomicide crimes</u> "may be devastating in their harm . . . but 'in terms of moral depravity and of the injury to the person and to the public,' . . . they <u>cannot be compared to murder in their 'severity and irrevocability.'"</u> This is because "[l]ife is over for the victim of the murderer," but for the victim of even a very serious nonhomicide crime, "life . . . is not over and normally is not beyond repair." <u>Although an offense like robbery or rape is "a serious crime deserving serious punishment," those crimes differ from homicide crimes in a moral sense.</u>

It follows that, when compared to an adult murderer, <u>a juvenile offender who did not kill or intend to kill</u> has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis.

<u>Id.</u> at 2027 (emphasis added) (citations omitted). Even though all that counts for § 2254(d)(1) purposes is the actual holding of a decision, the reasoning and language of <u>Graham</u>, like that of <u>Roper</u>, do contradict Loggins' position. A fairminded jurist certainly could conclude that neither of those decisions clearly establishes that a criminal who commits a murder when he is a juvenile cannot be sentenced to life without parole.

B.

Loggins attempts to extend the <u>Roper</u> and <u>Graham</u> decisions by arguing that their national consensus rationale should be used in this case. That attempt fails

43

because, as we have already noted, the Supreme Court has held that for §

2254(d)(1) purposes, only the holdings of its decisions matter. A rationale is not a

holding any more than a road is a destination. And even if extrapolation of

reasoning were permitted, it would not help Loggins here. It would not help him

because "objective indicia of society's standards, as expressed in legislative

enactments and state practice," see Graham, 130 S.Ct. at 2022 (quotation marks

omitted), do not indicate that there is a national consensus against sentencing

juveniles to life without parole for homicide crimes. If anything, objective indicia

indicate that there is a national consensus in favor of permitting the imposition of

that sentence on juveniles who commit murder.

In the Graham decision, the Supreme Court conducted a survey of state laws

regarding life without parole sentences for crimes committed by juveniles. See id.

at 2023, 2034–35. The survey revealed that 39 of 52 jurisdictions (counting the

District of Columbia and the federal government) permitted a sentence of life

imprisonment without parole for a nonhomicide crime committed by a juvenile.

See id. The Court did not, however, stop there, reasoning instead that "[t]here are

measures of consensus other than legislation" and that "[a]ctual sentencing

practices are an important part of the Court's inquiry into consensus." Id. at 2023.

44

And it was those "actual sentencing practices" that the Court used to reach the result that it did in Graham. See id. at 2023–26.

The Supreme Court's final tally of prisoners serving life without parole sentences for nonhomicide crimes they committed as juveniles amounted to 123 inmates nationwide, 77 of whom were in just one jurisdiction—Florida. Id. at 2024. The Court also found that "only 11 jurisdictions nationwide in fact impose life without parole sentences on juvenile nonhomicide offenders—and most of those do so quite rarely—while 26 States, the District of Columbia, and the Federal Government do not impose them despite apparent statutory authorization." Id.

Those numbers stand in stark contrast with the number of states imposing, and the number of inmates serving, life without parole for homicide offenses, which is what this case involves. A study by the National Conference of State Legislatures last year indicates that at least 2,465 inmates are serving a life without parole sentence for homicide crimes committed when they were juveniles. See National Conference of State Legislatures, Juvenile Life Without Parole 16 (Feb. 2010), available at http://www.ncsl.org/documents/cj/jlwopchart.pdf (last

visited Aug. 23, 2011) [hereinafter "National Conference Survey"].[6] Those 2,465

individuals are incarcerated in 41 different states, as well as in the federal penal

system. See id. at 1–16.

As for the nationwide trend, the National Conference Survey indicates that a

few jurisdictions have repealed laws permitting life without parole sentences for

homicides committed by juveniles—Texas in 2009, Montana in 2007, and

Colorado in 2006. See id. at 3, 9, 14. But more than 40 jurisdictions have not.[7]

And the actual number of life without parole sentences imposed for

homicides committed by juveniles has been substantially higher in recent years

---

[6] We reach the figure of 2,465 by subtracting the 109 persons serving a sentence of life without parole for a nonhomicide crime committed as a juvenile from the total number of 2,574 persons sentenced to life without parole for an offense committed while they were juveniles. National Conference Survey at 16. Some other studies put the total number of persons incarcerated with this sentence somewhat higher. See Human Rights Watch, State Distribution of Estimated 2,589 Juvenile Offenders Serving Juvenile Life Without Parole (Oct. 2009), available at http://www.hrw.org/sites/ default/files/related_material/updatedJLWOP10.09.pdf.

[7] We arrive at the conservative figure of "more than 40" this way: The National Conference Survey reports that "39 states [and] the federal government" allow a sentence of life without parole for juveniles convicted of homicide. See National Conference Survey at 16. That number excludes, however, at least three jurisdictions—Maine, New York, and West Virginia— that have no one imprisoned under that sentence for a homicide committed while a juvenile even though the laws of those jurisdictions would permit such a sentence. See id. at 7, 11, 15; Me. Rev. Stat. tit. 15, § 3101(4) & tit. 17-A, § 1251; N.Y. Penal Law §§ 10.00(18), 70.00(5), & 70.05; W. Va. Code. Ann. §§ 49-5-10, 61-2-2, & 62-3-15. And the Supreme Court in Graham listed Maine as allowing a sentence of life without parole for a juvenile convicted of homicide, and New York and West Virginia as allowing the sentence even for a nonhomicide crime. See 130 S.Ct. at 2035.

46

than it was in the 1960s, 1970s, and early 1980s.  See Amnesty International &

Human Rights Watch, The Rest of Their Lives:  Life Without Parole for Child

Offenders in the United States 31 fig.3 (2005), available at

http://www.hrw.org/sites/default/files/reports/The Rest of Their Lives.pdf

[hereinafter "Amnesty International Report"].[8]  In the late 1980s and early 1990s

there was a steady increase in the number of life without parole sentences imposed

for juvenile crimes, a trend that peaked in 1996 when 152 of them were imposed

nationwide.  See id.  During 2003, the most recent year for which there is complete

data, 54 life without parole sentences were imposed for juvenile crimes, an annual

figure roughly the same as those in the late 1980s.  See id.  While that number is

well below that of 1996, the peak year, it is significantly higher than the number of

such sentences imposed annually from 1962 through 1981.  See id.  A total of only

32 life without parole sentences were imposed during that entire twenty-year

---

[8] Although the statistics we have found concerning the number of life without parole sentences imposed for juvenile crimes over the years are not broken down between homicide and nonhomicide crimes, it is safe to assume that the vast majority of those life without parole sentences imposed for juvenile crimes are imposed for homicides.  That is evident from the fact that in 2010 there were only 123 inmates serving life without parole for nonhomicide crimes they committed as juveniles, Graham, 130 S.Ct. at 2024, while in 2009 there were 2,574 inmates serving life without parole sentences for either homicide or nonhomicide crimes committed as juveniles, see National Conference Survey at 16, indicating that in that two-year period somewhere in the range of 95 percent of the life without parole sentences that were being served by juveniles were for homicides.

47

period—none in six of those years, only one in each of seven years, and never more than six a year. See id. By contrast, in the ten-year period of 1994 through 2003 there were a total of 1,081 such sentences, an average of 108 per year. See id.

In sum, the available data indicates that while a few jurisdictions have changed their laws to eliminate a sentence of life without parole for homicide crimes committed by juveniles, the vast majority of them have not. Such sentences are still permitted in more than 40 jurisdictions. Moreover, the number of such sentences that have been imposed in the most recent ten-year period for which data is available is far greater than the number imposed in the twenty-year period before then. The long-term national trend is not away from life without parole sentences for homicides committed by juveniles but toward them.

This situation is significantly different from the one that the Supreme Court considered when it decided in Graham that life without parole sentences could not be imposed for nonhomicide crimes committed by juveniles. Even if a nationwide trend or a national consensus were enough for § 2254(d)(1) purposes—and they are not—there is no such trend away from or consensus against life without parole as punishment for juveniles who commit murder.

## C.

Loggins also argues that there is an "international consensus" against sentencing juveniles to life without parole and for that reason it is unconstitutional. In his words, "[t]he opinion of the world community is . . . clearly united against the practice of sentencing adolescents to life in prison without the possibility of parole." Brief of Appellant at 26. That may well be true, but we have not yet turned constitutional interpretation over to other countries or their people. More to the point, no decision of the Supreme Court clearly establishes that if other countries do not impose a type of non-capital sentence for a given crime and category of criminal, it is unconstitutional to do so in this country. An international consensus against a given sentence for a type of crime and category of criminal may provide fodder to feed law review articles, symposia, and social science research, and it may serve as a make-weight argument for a result arrived at through other reasoning. But it cannot be decisive in constitutional analysis. See Graham, 130 S.Ct. at 2033 (observing that even though a court can look to international law to support an independent conclusion that a punishment is cruel and unusual, "[t]he judgments of other nations and the international community are not dispositive as to the meaning of the Eighth

Amendment"). All the international consensus in the world cannot establish that a state court judgment upholding a sentence was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

D.

Loggins directs us to two treaties dealing with the treatment of juvenile criminals. To the extent that his point is that those treaties evidence that the international community (to risk an oxymoron) is opposed to sentencing juvenile murderers to life imprisonment without parole, that point is subsumed in the international consensus argument, which we have just rejected. To the extent, however, that Loggins is arguing that those two treaties bind this country to outlaw life without parole sentences for juvenile murderers, he is wrong.

The first treaty Loggins relies on is the United Nations Convention on the Rights of the Child, which provides in Article 37 that:

> No child shall be subjected to torture or other cruel, inhuman and degrading treatment or punishment. Neither capital punishment nor life imprisonment without possibility of release shall be imposed for offences committed by persons below eighteen years of age.

United Nations Convention on the Rights of the Child, art. 37(a), opened for signature Nov. 20, 1989, 1577 U.N.T.S. 3, 28 I.L.M. 1448. That treaty, however,

50

does not restrict any state or the federal government because the United States has not ratified it.  See Graham, 130 S.Ct. at 2034.

The second treaty that Loggins relies on is the International Covenant on Civil and Political Rights (ICCPR).  The United States has ratified that treaty, but only with express reservations as to the only two sections that even arguably could have supported Loggins' position.  Article 10 provides:

> 1.  All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person.
>
> ***
>
> 2.(b)  Accused juvenile persons shall be separated from adults and brought as speedily as possible for adjudication.
>
> 3.  The penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation. Juvenile offenders shall be segregated from adults and be accorded treatment appropriate to their age and legal status.

ICCPR, art. 10, adopted Dec. 16, 1966, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976 and ratified by the United States June 8, 1992).  And Article 14, which addresses criminal procedures, provides:

> 4.  In the case of juvenile persons, the procedure shall be such as will take account of their age and the desirability of promoting their rehabilitation.

51

Id. at art. 14.

Referring to Article 14 in particular, Loggins argues: "The United States' practice of sentencing juvenile offenders to sentences of life without the possibility of parole is in direct conflict with Article 14(4) of the ICCPR because it rejects entirely the capacity of an adolescent for rehabilitation." Brief of Appellant at 26. That interpretation is questionable, however, because Article 14(4) provides that a juvenile's age and the desirability of rehabilitation must be taken into account, not that those two factors ought to be controlling in every case and not that they cannot be outweighed by the crime in an entire category of cases, such as murder cases. More importantly, even if we accept Loggins' interpretation, the United States' reservations to the treaty expressly address the very provisions that Loggins attempts to rely on. Specifically, paragraph 5 of the United States' reservations explains:

> That the policy and practice of the United States are generally in compliance with and supportive of the Covenant's provisions regarding the treatment of juveniles in the criminal justice system. Nevertheless, the United States reserves the right, in exceptional circumstances, to treat juveniles as adults, notwithstanding paragraphs 2(b) and 3 of article 10 and paragraph 4 of article 14.

U.S. Reservations, Declarations and Understandings, ICCPR, 138 Cong. Rec. 8071 (1992). A murder, especially one as vicious as the one in this case, is an exceptional circumstance justifying treatment of the juvenile as an adult.

And most importantly, § 2254(d)(1) does not include within its focus international treaties. It focuses exclusively on the holdings of Supreme Court decisions, and there is no Supreme Court decision holding that juvenile murderers cannot be sentenced to life without parole because of any treaty or for any other reason.

## V.

Loggins also contends that by charging him under its capital punishment statute the State "impermissibly expressed its intent to seek the death penalty against him and prevented [him] from exercising his Eighth Amendment right to present meaningful, mitigating evidence of his youthfulness to a sentencing jury." Brief of Appellant at 35. And he contends that by automatically resentencing him to life imprisonment without parole the State "violated [his] Eighth Amendment and Fourteenth Amendment Due Process rights because he was entitled to present mitigating evidence at a sentencing hearing before resentencing." Id. at 39.

But where the law requires a mandatory sentence, it would be pointless to allow the presentation of mitigating circumstances evidence to the sentencing court, and the Constitution does not require pointless procedures or proceedings. The Alabama courts have held that when a death sentence is invalidated under the Roper decision, Alabama law requires that the defendant be resentenced to life imprisonment without parole. See, e.g., Adams v. State, 955 So. 2d 1107, 1108–09 (Ala. Crim. App. 2005); Duncan v. State, 925 So. 2d 245, 252 (Ala. Crim. App. 2005). And Alabama law is what the Alabama courts hold that it is. See Kennedy v. Louisiana, 554 U.S. 407, 425, 128 S.Ct. 2641, 2652 (2008); Bradshaw v. Richey, 546 U.S. 74, 76, 126 S.Ct. 602, 604 (2005); Bolender v. Singletary, 16 F.3d 1547, 1571 (11th Cir. 1994). So, Alabama law did require the imposition of a mandatory life without parole sentence after Loggins' death sentence was set aside, as the Alabama Court of Criminal Appeals held in Loggins' own case. Loggins v. State, No. CR-04-1567 (Ala. Crim. App. Apr. 21, 2006) (unpublished memorandum opinion); Loggins v. State, No. CR-04-1567 (Ala. Crim. App. Dec. 8, 2005) (order remanding to trial court for resentencing).

As required by Alabama law, at his resentencing Loggins was mandatorily sentenced to life without parole the same as if it had been the maximum and only

sentence prescribed for him and his crime from the beginning. The issue, then, is whether it is unconstitutional to sentence a defendant who committed a murder while he was a juvenile to a mandatory sentence of life without parole. Loggins claims that it is, but he has not cited a single decision of any federal court that even comes close to holding that.[9] Loggins' argument that defendants must be allowed to present mitigating circumstances in opposition to a sentence less than

---

[9] Loggins quotes one sentence from the Graham opinion that at first blush appears to support his position. In response to the State of Florida's argument in Graham that its state procedural laws took juvenile status into account in several ways, the Supreme Court remarked that such efforts are "salutary" and said that "[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." Graham, 130 S.Ct. at 2031. That was not, however, a holding that mandatory life without parole sentences for juvenile murderers are unconstitutional and, as we have explained already, only actual holdings of the Supreme Court can clearly establish the law for § 2254(d)(1) purposes.

Not only that, but the context in which the quoted statement appears in Graham shows that the Court was talking about a state's entire criminal process, not about sentencing for a particular crime. See id. at 2030–31 (listing as ways in which Florida law took youthfulness into account the discretion it gave prosecutors about whether to charge juveniles as adults for certain non-serious felonies and its prohibition against charging non-recidivist juveniles as adults in misdemeanor cases). Besides, Alabama law, which is applied in compliance with the Roper decision, does take a defendant's youthfulness into account when sentencing in murder cases—only juveniles are exempt from death sentences for the commission of capital murders.

Loggins also cites State v. Morgan, 626 S.E.2d 888 (S.C. 2006), a case in which the South Carolina Supreme Court determined that a defendant whose capital sentence was vacated as a result of Roper should be given a full sentence hearing with the opportunity to present evidence and argument that he was entitled to a sentence other than life imprisonment without the possibility of parole. Id. at 889. That decision, however, was based on an interpretation of a South Carolina statute, not on federal law. Id. Of course, that South Carolina statute, and the decision interpreting it, do not apply to this case.

55

death relies on Roper and Graham, but neither decision held that a mandatory sentence of life imprisonment without parole could not be imposed on a defendant for committing a murder while he was a juvenile. And, as we have already explained, Roper actually affirmed a state appellate court judgment that had reduced the defendant's death sentence to life imprisonment without parole at the appellate level without ordering a new sentence hearing, an action that deprived the defendant of any opportunity to present evidence of mitigating circumstances. That is exactly what happened in this case.

The Supreme Court has made clear that a sentence that could constitutionally be imposed by a trial court in the exercise of its discretion is no less constitutional because it is mandatorily imposed under the requirements of a statute. In Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680 (1991), the Court upheld a mandatory sentence of life without parole for a defendant with no prior convictions who was convicted of selling less than a kilogram of cocaine. Id. at 961, 994, 996, 111 S.Ct. at 2684, 2701–02. In doing so, the Court rejected the claim that it was unconstitutional "to impose a mandatory sentence of such severity, without any consideration of so-called mitigating factors." Id. at 994, 111 S.Ct. at 2701. The Court noted that the petitioner's contention would have

required the State "to create a sentencing scheme whereby life in prison without parole is simply the most severe of a range of available penalties that the sentencer may impose after hearing evidence in mitigation and aggravation." Id. at 994, 111 S.Ct. at 2701. In rejecting that claim, the Court explained:

> As our earlier discussion should make clear, this claim has no support in the text and history of the Eighth Amendment. Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history. As noted earlier, mandatory death sentences abounded in our first Penal Code. They were also common in the several States—both at the time of the founding and throughout the 19th century. There can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is "mandatory."

Id. at 994–95, 111 S.Ct. at 2701 (citations omitted). The Court did acknowledge that the defendant's claim found "support in [its] death penalty jurisprudence," but it refused "to extend this so-called individualized capital-sentencing doctrine[] to an individualized mandatory life in prison without parole sentencing doctrine." Id. at 995, 111 S.Ct. at 2701–02 (quotation marks and citation omitted). As this Court has recently noted, "the Harmelin Court scoffed at the idea that depriving the sentencer of discretion to consider mitigating circumstances could make any difference in whether a non-capital sentence was constitutionally disproportionate." United States v. Farley, 607 F.3d 1294, 1339 (11th Cir. 2010).

Given the absence of any support for Loggins' claims about the mandatory nature of the life without parole sentence imposed on him and given the presence of Supreme Court decisions strongly indicating that his claims have no merit, he has failed to carry his burden of establishing that no fairminded jurist could agree with the Alabama courts' rejection of those claims. He has again failed to show that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Finally, Loggins argues that: "Because a state cannot seek the death penalty against a juvenile, a juvenile cannot be charged with a capital offense in Alabama, and [his] conviction under that statute is in violation of the Eighth Amendment." Brief of Appellant at 36. That argument is based on a mischaracterization of "capital offense" under Alabama law, and it is also wrong for other reasons.

Under the Alabama statute capital offenses include various types of aggravated murder, including "Murder . . . during a kidnapping in the first degree or an attempt thereof," Ala. Code § 13A-5-40(a)(1), which is the capital offense Loggins was convicted of committing. A capital offense, such as the one Loggins committed, is not an offense for which the defendant will be sentenced to death. It

is an offense for which the defendant will be sentenced either to death or to life imprisonment without parole depending on the circumstances. See id. § 13A-5-39; see also id. § 13A-5-45. Alabama law, as interpreted and applied by the Alabama courts, provides that in any case in which the defendant was sentenced to death and that sentence is later determined to be unconstitutional, a sentence of life without parole is to be imposed. See id. § 13A-5-45(a) ("Upon conviction of a defendant for a capital offense, the trial court shall conduct a separate sentence hearing to determine whether the defendant shall be sentenced to life imprisonment without parole or to death."); Wimberly v. State, 931 So. 2d 60, 63 (Ala. Crim. App. 2005) (applying Roper and holding: "Because [the defendant] was under the age of 18 when he committed the [capital] murders, his sentence of death is due to be set aside. This case must be remanded for the [trial court] to set aside [the defendant's] death sentence and to sentence him to the only other available sentence—life in the penitentiary without the possibility of parole."); Duncan, 925 So. 2d at 252 (holding that under Roper it was unconstitutional to impose death sentence on the defendant, who was seventeen years old when he committed the capital offenses of kidnapping-murder and robbery-murder, and "remand[ing] this case to the circuit court for that court to set aside the

[defendant's] sentence of death and to resentence him to imprisonment for life without the possibility of parole").

So, while a juvenile who commits a murder cannot be executed, and can no longer be sentenced to death, it is not accurate to assert, as Loggins does, that he cannot be charged with a "capital offense." He can be charged with a capital offense, as Loggins was, and the penalty that Alabama law provides for juveniles who commit a capital offense is life without parole, and that is the sentence Loggins received after Roper, and it is the sentence he is now serving.

The fact that Loggins was sentenced to death after being convicted of a capital offense before the Roper decision was issued simply reflects the fact that the State of Alabama and its courts, like most states and courts, lacked the clairvoyance to know that the Supreme Court would do an about-face and rule out death sentences for seventeen-year-old murderers, after it had previously ruled them in. See Stanford v. Kentucky, 492 U.S. 361, 380, 109 S.Ct. 2969, 2980 (1989) overruled by Roper, 542 U.S. 551, 125 S.Ct. 1183. To the extent that Loggins' argument includes the proposition that a state's failure to anticipate the Roper decision somehow disentitles it from imposing the next most severe penalty its law allows, there is nothing in law or logic to support that proposition. If, as

we are holding, <u>Roper</u> does not prevent a state from imposing a life without parole sentence on a defendant who committed murder at age seventeen, it does not prevent a state from vacating a death sentence to comply with the <u>Roper</u> decision and resentencing the defendant to life without parole. As we have pointed out, that is exactly what the state appellate court, whose judgment was affirmed in <u>Roper</u> itself, did. And, once again in terms of the applicable legal standard, no Supreme Court decision clearly establishes that the Court of Criminal Appeals could not order the trial court to impose on Loggins a mandatory sentence of life imprisonment without parole after it had vacated his death sentence in order to comply with the <u>Roper</u> decision.

**AFFIRMED.**